**Alfonzo HARRIS, Plaintiff,**

v.

**BUCKEYE CELLULOSE CORP., Defendant.**

Civ. A. No. 86–238–1–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

March 7, 1988.

James A. Barnett, Atlanta, Ga., for plaintiff.

John G. Skinner, Atlanta, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

Plaintiff, Alfonzo Harris, in his complaint against Buckeye Cellulose Corporation (Buckeye), has alleged that the treatment he received from Buckeye subsequent to his being afflicted with a medical disorder was discriminatory and in violation of 42 U.S.C. § 2000e, *et seq.* Buckeye has moved for summary judgment on the grounds

that: (1) Mr. Harris has utterly failed to present evidence sufficient to demonstrate a *prima facie* case of discrimination; and (2) even if such a *prima facie* case has been made out by plaintiff, Buckeye has presented overwhelming evidence of a legitimate, non-discriminatory reason for its actions. Mr. Harris, through his attorney, has had an opportunity to present all evidence he considers relevant to the instant dispute, and, therefore, Buckeye's motion for summary judgment is ready for decision.

### Findings of Undisputed Fact

1. Mr. Harris, a black male, was hired by Buckeye on September 8, 1980. He was assigned to work in the Woodyard Unit. In that position, his primary job responsibilities were operating bulldozers, a railroad switch engine, and other heavy equipment.

2. On July 18, 1984, Mr. Harris complained of severe headaches. He experienced a blackout, and was taken home. Affidavit of F.D. Hooper, ¶ 4.

3. On July 19, 1984, Mr. Harris went to Dr. Richard Chase. Dr. Chase signed a medical excuse for Mr. Harris indicating that he had suffered "r/o seizure disorder." *See* Exhibit 1 attached to Buckeye's Motion for Summary Judgment.

4. Mr. Harris returned to work on July 19, 1984, and was given light duty work to perform. (Affidavit of F.D. Hooper, ¶ 6).

5. On July 20, 1984, after consulting with the company's medical department, Lisa Routh, Mr. Harris' manager, informed Mr. Harris that he should not return to work until after his July 27, 1984, medical appointment. Affidavit of F.D. Hooper, ¶ 7.

6. After seeing the doctor on July 27, 1984, Mr. Harris was to undergo further testing scheduled for August 1, 1984 through August 3, 1984. Affidavit of F.D. Hooper, ¶ 8.

7. Mr. Harris subsequently returned to work on August 6, 1984, and was placed on light duty status. At that time, he was medically restricted from climbing and operating heavy equipment such as cranes, railroad switch engines, and trucks. *See* Exhibit 2 attached to Buckeye's Motion for Summary Judgment.

8. On August 16, 1984, Mr. Harris was medically certified for full work duties. *See* Exhibit 3 attached to Buckeye's Motion for Summary Judgment.

9. On August 21, 1984, Mr. Harris suffered another spell of bad headaches and blacking out. Affidavit of F.D. Hooper, ¶ 11.

10. As a result of the August 21 incident, Dr. Dean, a physician employed by Buckeye, contacted Mr. Harris' physicians. Based upon the information he learned, Dr. Dean recommended that Mr. Harris not operate heavy equipment, work at heights, or perform tasks which required climbing. Mr. Harris was then transferred to the day shift for light duty work until more information became available regarding his medical condition. *See* Exhibit 4 attached to Buckeye's Motion for Summary Judgment; and Affidavit of F.D. Hooper, ¶ 12.

11. On September 20, 1984, Dr. Dean recommended that Mr. Harris resume his normal duties. Affidavit of F.D. Hooper, ¶ 13.

12. On September 29, 1984, plaintiff was exposed to low levels of $H_2S$. He complained at the time that he had a burning in the top of his head and nose, his chest hurt, and his left arm was numb. Mr. Harris was taken to the hospital and treated for this exposure. *See* Exhibits 5 and 6 attached to Buckeye's Motion for Summary Judgment.

13. On November 9, 1984, Mr. Harris backed a large bulldozer over a light pole and into a large pond. It was necessary for a co-worker to jump onto the bulldozer to shut it off. When asked, Mr. Harris could not remember what happened during this incident. Mr. Harris was told not to return to work until more information on his medical condition could be ascertained. *See* Exhibit 10 attached to Buckeye's Motion for Summary Judgment; and Affidavit of F.D. Hooper, ¶¶ 16 and 17.

14. On November 15, 1984, Lisa Routh contacted Mr. Harris to determine the sta-

tus of his illness. Mr. Harris informed Ms. Routh that Dr. Wells had concluded that he was suffering from some type of seizure disorder or that certain smells or chemicals could be causing the seizures. Mr. Harris also stated that Dr. Adams had decreased his Dilantin, an anticonvulsant medication, that Dr. Wells was considering changing his medication to Tegretol, and that further testing was to be conducted. Affidavit of F.D. Hooper, ¶ 18.

15. On December 10, 1984, Mr. Harris was examined by Dr. Wells in Macon, Georgia. Dr. Wells recommended that he continue on his present medication and concluded that he could return to work under restrictions. Dr. Wells recommended that Mr. Harris not work at heights or with heavy equipment. Further, Dr. Wells recommended that the restrictions stay in place for at least one year. If he did not have a reoccurrence of headaches or seizures during that year, his safety risk would be reevaluated. *See* Exhibit 11 attached to Buckeye's Motion for Summary Judgment.

16. The medical restrictions placed on plaintiff by his personal physician prevented him from performing his normal duties of operating heavy equipment in the Woodyard Unit. There was no work available within the Woodyard that plaintiff could safely perform with the restrictions placed on him by his physician. Affidavit of F.D. Hooper, ¶ 20.

17. In the past when a Buckeye employee had been placed on medical restrictions, he normally was given light duty work at his normal rate of pay. Because of the potential length of his disability, however, Mr. Harris was told that his options were: (1) the company could place him in available work which was consistent with his qualifications and limitations; (2) if such work was not available, plaintiff could apply for disability benefits under the Proctor & Gamble Disability Plan; or (3) if he chose not to perform available work or apply for disability benefits, he could resign. *See* Exhibit 11 attached to Buckeye's Motion for Summary Judgment; and Affidavit of F.D. Hooper, ¶ 21.

18. Buckeye had several temporary clerical employees working in the Invoice Approval Department which is located in the company's administration building. It was willing to let one of the temporary clericals go in order to place Mr. Harris in the job created by the dismissal of the temporary employee. Mr. Harris was offered, and accepted, the assignment on a temporary basis. Affidavit of F.D. Hooper, ¶ 23.

19. On December 12, 1984, plaintiff was assigned to the Invoice Approval Department where he performed various clerical functions. Employees in the Invoice Approval Department are compensated at a lower rate than production employees. Buckeye decided to place Mr. Harris in the middle of the pay range for administrative employees working in the Invoice Approval Department. His pay, therefore, was cut from $12.95 per hour to $10.20 per hour. Affidavit of F.D. Hooper, ¶ 24.

20. At the time plaintiff accepted this position, he was offered the option of applying for partial disability benefits under the Proctor & Gamble Disability Benefit Plan. Partial disability benefits are provided to participants who are partially disabled, but who are able to perform some work other than their regular assignment. The partial disability benefits are paid in an amount equal to the difference between the participant's base rate on the new job and the base rate of the former job. *See* Exhibit 12—Article VII, Section 1.

21. Had plaintiff requested partial disability benefits, his rate of pay for his position in the Invoice Approval Department would have been supplemented in an amount to equal the rate of pay he had received for the production job which he had previously performed. Thus, if plaintiff has requested partial disability benefits, his pay would have been unaffected. Plaintiff chose not to apply for partial disability benefits. Affidavit of F.D. Hooper, ¶¶ 25 and 26.

22. On December 13, 1984, Mr. Harris had another incident while working in the Invoice Approval Department. He suddenly noticed an odor which "open[ed] up [his]

head." Recognizing the symptom as a forerunner to one of his blackout spells, Mr. Harris started to the men's room. En route, he lost awareness of what was going on. A friend observed him near the water fountain and described him as looking "dazed and confused." This same friend walked him to the infirmary where he "woke up." When he came around, he had a pain behind his eyes and in the back of his neck. Plaintiff had no recollection of what happened in the interim. *See* Exhibit 13 attached to Buckeye's Motion for Summary Judgment.

23. Dr. Wells again examined Mr. Harris on December 17, 1984. At that time he was restricted from operating any motor vehicle. Dr. Wells recommended that he be kept in a protected environment free of potentially dangerous equipment. Further, Dr. Wells stated that, if Mr. Harris' seizures continued to occur despite the taking of anticonvulsant medication, he should be referred to Augusta or the Emory Medical Center for monitoring of the spells. Dr. Wells also stated that even though he initially felt strongly that the spells were complex partial seizures, the possibility existed that the spells were pseudo-seizures. *See* Exhibits 13 and 14 attached to Buckeye's Motion for Summary Judgment.

24. On February 1, 1985, and on April 18, 1985, Mr. Harris visited Dr. Wells. Mr. Harris complained of fatigue and frustration. He also stated that he believed the symptoms that he was suffering from were related to the medications that he was taking, and that he would like to discontinue the medication. Dr. Wells arranged for Mr. Harris to visit the seizure clinic at the Medical College of Georgia as an out-patient for a second opinion. Although Dr. Wells still felt that at least some of Mr. Harris' spells were partial complex seizures, plaintiff insisted that the spells were caused by exposure to chemicals at work. *See* Exhibits 15 and 16 attached to Buckeye's motion for summary judgment.

25. On July 2, 1985, Mr. Harris met with Dennis Hooper, Employee Relations Manager, Martha Smith, Benefits Administrator, and Donna Smith, Buying Manager. The meeting was conducted to explain again to him his option for applying for partial disability benefits to supplement his administrative pay rate in an amount to equal the rate of pay he had received as a production employee in the Woodyard. This option had been explained to Mr. Harris on at least three prior occasions—December 12, 1984, February, 1985, and on April 22, 1985. Plaintiff again chose not to apply for partial disability benefits. Affidavit of F.D. Hooper, ¶ 30.

26. On August 29, 1985, Dr. Anthony Murrow, a neurologist at the Medical College of Georgia, to whom Mr. Harris had been referred, wrote a letter releasing Mr. Harris to full time employment. Dr. Murrow, however, restricted Mr. Harris from operating a motor vehicle or dangerous machinery until he had been seizure-free for one year. Plaintiff could, thus, not perform his regular job duties of operating the heavy equipment in the Woodyard while these restrictions were in effect. Affidavit of F.D. Hooper, ¶ 31; and Exhibit 19 attached to Buckeye's Motion to Dismiss.

27. On September 17, 1985, plaintiff was informed by Donna Smith that his temporary position in the Invoice Approval Department would end effective September 27, 1985. Ms. Smith further told him that no other non-operational position existed in the plant or administration building which he was qualified to perform. Mr. Harris was also informed that, based on medical recommendations, he would not be able to return to his former position in the Woodyard. Mr. Harris' only options left, then, were either to apply for disability benefits or resign. His last day of work in the administration building was on September 27, 1985. He later applied for disability benefits on September 30, 1985. Affidavit of F.D. Hooper, ¶¶ 32 and 33.

28. Plaintiff was examined by Dr. Wells on October 1, 1985. In his report, Dr. Wells recommended that Mr. Harris avoid working off the ground and to avoid operating heavy or potentially dangerous equipment. With these restrictions in place, it was impossible for Mr. Harris to resume his duties as an operator of heavy equip-

ment in the Woodyard. Affidavit of F.D. Hooper, ¶ 35; and Exhibit 18 attached to Buckeye's Motion for Summary Judgment.

29. Mr. Harris' application for disability benefits was approved by the Board of Trustees for the Proctor & Gamble Disability Benefit Plan on November 4, 1985. Payment of disability benefits was made retroactive to September 30, 1985. These disability payments were based upon Mr. Harris' salary while working in the Woodyard. See Exhibit 19 attached to Buckeye's Motion for Summary Judgment.

30. On December 6, 1985, Mr. Harris discussed with Dennis Hooper the possibility of returning to work. Mr. Harris stated to Mr. Hooper that according to the information received from Dr. Murrow, he should be able to return to work since he had been seizure free for a year. Mr. Hooper explained that it would be necessary for his treating physician, Dr. Wells, to release him before he could be reinstated to his former position. Also at that time, Mr. Hooper questioned him about the June, 1985, incident in which Mr. Harris allegedly went to the company's Medical Department complaining of preseizure symptoms. Mr. Harris replied that he was not aware of any such incident and denied that such an incident ever occurred. Affidavit of F.D. Hooper, ¶ 36.

31. On March 27, 1986, Dr. Murrow wrote a letter to Buckeye stating that Mr. Harris had been free of seizures since June of 1984, and recommended that he be given full employment without restrictions. The information in Dr. Murrow's March 27, 1986, letter conflicted with the information in his August 29, 1985, letter. See Exhibits 17 and 20 attached to Buckeye's Motion for Summary Judgment.

32. On April 9, 1986, Dr. Wells released Mr. Harris for full employment based on the recommendation of the Medical College of Georgia. Dr. Wells noted the discrepancy regarding the date of Mr. Harris' last seizure. Mr. Harris asserted that it was in June of 1984. Dr. Wells, however, was aware of at least two other incidents, in December, 1984, and June, 1985, which may or may not have been seizures. See Exhibit 21 attached to Buckeye's Motion for Summary Judgment.

33. Because of the conflicting medical evidence received from Mr. Harris' personal physicians, Buckeye's physician, Dr. Charlie Dean, requested that Dr. Murrow reevaluate Mr. Harris' case, taking into consideration the particular hazards that Mr. Harris was routinely exposed to in the course of his normal duties of operating heavy equipment. Since Dr. Wells had raised the possibility that Mr. Harris' seizures were psychosomatic, Dr. Dean also requested that Dr. Murrow arrange for a complete psychiatric evaluation of Mr. Harris. A copy of the letter to Dr. Murrow and a similar request for additional information was sent to Dr. Wells on April 30. See Exhibits 22 and 23 attached to Buckeye's Motion for Summary Judgment; and Affidavit of F.D. Hooper, ¶ 37.

34. In the six weeks after the requests were sent to Drs. Murrow and Wells, Buckeye made repeated attempts to contact these physicians. By letter dated June 6, 1986, Dr. Murrow stated to Buckeye that he considered the risk of Mr. Harris hurting himself or others to be low should he be allowed to return to full employment with defendant. This letter was received by the company on June 12, 1986. See Affidavit of F.D. Hooper, ¶ 38; and Exhibit 24 attached to Buckeye's Motion for Summary Judgment.

35. Mr. Harris was reinstated to his former position as an operator of heavy equipment on June 17, 1986. Affidavit of F.D. Hooper, ¶ 38.

36. Each time when Mr. Harris was on disability leave, July 18 through August 5, 1984, November 10 through December 11, 1984, and September 30, 1985, through June 16, 1986, plaintiff received disability benefits based upon the Woodyard production employee rate of pay. Affidavit of F.D. Hooper, ¶ 39.

37. No individuals were hired into the administration building between September 27, 1985, and June 17, 1986. Affidavit of F.D. Hooper, ¶ 34.

38. Each time Mr. Harris was placed on light duty status in the Woodyard while awaiting a medical diagnosis, *i.e.*, from August 6–16, 1984, and August 23 through September 20, 1984, Mr. Harris retained his production employee rate of pay. Affidavit of F.D. Hooper, ¶ 40.

### Conclusions of Law

In passing upon a motion for summary judgment in an employment discrimination action, the court is aware that generally, "summary judgment is an inappropriate tool for resolving claims of employment discrimination" because they usually involve nebulous questions of motivation and intent." *See Thornbrough v. Columbus and Greenville R.R.*, 760 F.2d 633, 640 (5th Cir.1985); *Beard v. Annis*, 730 F.2d 741, 743 (11th Cir.1984); and *Hayden v. First National Bank*, 595 F.2d 994, 997 (5th Cir.1979). Saying this, however, does not necessarily mean that summary judgment can never be granted in an employment discrimination case. This fact was recognized by the Eleventh Circuit in *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590 (11th Cir.1987), wherein the circuit court found that even if the plaintiff has demonstrated a *prima facie* case of discrimination, the defendant's evidence of a legitimate, non-discriminatory reason for its actions may be so strong as to rebut completely the inference raised by the plaintiff's *prima facie* case. Where such strong justification evidence is presented by the defendant, despite the fact that the plaintiff has demonstrated a *prima facie* case, the plaintiff must present additional evidence of pretext in order to avoid the entry of summary judgment. *Id.* at 595–96. With this standard in mind, the court will now proceed to the merits of plaintiff's case.

### A. Disparate Treatment:

The first claim made by Mr. Harris is that, because of his race, he was treated differently from other comparably situated employees working at Buckeye. Proof of such a fact would demonstrate a *prima facie* case of discrimination actionable under Title VII. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185–86 (11th Cir.1984) (A *prima facie* case of discrimination can be demonstrated by a showing that a comparably situated person outside of the protected class was treated differently). The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), has set forth a tripartite order and allocation of proof for establishing whether or not such motivation existed, namely;

(1) the plaintiff must establish a *prima facie* case;

(2) the defendant must offer a legitimate, non-discriminatory reason for its actions; and

(3) the plaintiff must establish that this supposedly legitimate, non-discriminatory reason was a pretext to mask an illegal motive.

In order to prove these types of allegations, plaintiff may utilize three types of evidence—direct evidence of illegal motive, such as evidence of bigoted or otherwise discriminatory statements made by the defendant; statistical evidence; and comparative evidence demonstrating that similarly situated employees were treated more favorably if they were not a member of a plaintiff's class.

Now, to prove his *prima facie* case, Mr. Harris has not presented any statistical evidence of discrimination or direct evidence of illegal motive. He has presented, however, evidence of two white employees at Buckeye that were allegedly treated more favorably than himself. The key question that the court must decide, then, is whether these two persons were comparably situated with Mr. Harris, and, if so, whether they were treated more favorably than Mr. Harris.

The first person named by Mr. Harris is Joyce Dougherty, a white female production employee with Buckeye. Mr. Harris alleges that Ms. Dougherty was transferred to the administration building after she could no longer perform her duties due to a back problem. He further contends that Ms. Dougherty retained her previous rate of pay upon being transferred, whereas his

was cut. *See* Affidavit of Alfonzo Harris, ¶ 31. Mr. Harris does not support these allegations with any evidence other than his own conclusions. In rebuttal, however, Buckeye has demonstrated that Ms. Dougherty was transferred, not because of her back problem, but rather because a position existed in the administration building for which she was qualified. Ms. Dougherty had previously expressed an interest in working in the administration building, but had been turned down in favor of a more qualified individual. And while Ms. Dougherty did retain the same rate of pay after being transferred to the administrative building, this was because the position that she filled in the administrative building was compensated at the same rate of pay that she received in her previous position. Furthermore, Ms. Dougherty, like Mr. Harris, had been informed by Buckeye that if there was no work consistent with her physical limitations, her employment could be terminated. *See* Affidavit of F.D. Hooper, ¶ 41. The court finds that Mr. Harris' unsupported conclusory statements about this employee are simply not supported in the record, and, therefore, disparate treatment has not been shown for purposes of this summary judgment motion. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The next employee held out by Mr. Harris as an example of disparate treatment is Gerald Vaughn. Mr. Vaughn is a white production employee in the Powerhouse Unit at Buckeye. Mr. Harris states in his affidavit that due to a medical condition, Mr. Vaughn was transferred to the administrative area without a cut in pay, without a reduction in salary, and without a threat of job termination. In response to these conclusory allegations, Buckeye has presented evidence that Mr. Vaughn was on medical disability leave from January, 1984, through April, 1984, and again from January, 1985, through May, 1985, because of a herniated disc. In May of 1985, prior to being released to resume his normal job

duties, Mr. Vaughn was offered and accepted a temporary cost analysis job which had previously been performed by a management person. At the time he was given this job, Buckeye anticipated that the position would last about four to five months. It soon became clear to Buckeye's management, however, that the cost analysis position was a valuable asset in the Unit's operation, and, therefore, it was made permanent. Buckeye decided to keep Mr. Vaughn in this position for one to three years, after which time he would be reinstated to his original position and another employee would be "rotated" into the job. As with other special "rotating" positions filled by production employees, such as the Maintenance Planner, Preventive Maintenance Coordinator, and Shift Coordinator, Buckeye has presented evidence to show that employees filling these jobs retained the job responsibilities that they had had prior to accepting the rotating position. Mr. Vaughn, therefore, retained his previous rate of pay not because of any favored treatment, but rather because of the company's policy with regard to "rotating" jobs. In fact, after it became clear that Mr. Vaughn would be unable to return to his previous duties in the Powerhouse, Buckeye decided to remove the production employee responsibilities from Mr. Vaughn's career plan, while at the same time, because of the excellent performance he had achieved in the cost analysis position, they decided to place him permanently into that position. After taking this job on a permanent basis, however, Mr. Vaughn was moved to the administrative building and his pay was cut to a level consistent with that of other administrative employees. *See* Affidavit of F.D. Hooper, ¶ 42. Looking at these facts, the court does not believe a *prima facie* case of disparate treatment has been shown. Mr. Harris has utterly failed to demonstrate that comparably situated persons were treated any differently from himself, and, accordingly, he has not proven any illegal motive on the part of Buckeye.[1] Without proof of a *pri-*

---

1. Mr. Harris also states in his affidavit that another employee, Debbie Hearns, a white female technician, performed in the Woodyard Unit light duty work for a period of time be-

ma facie case of discrimination, Mr. Harris' claims based upon disparate treatment should be dismissed.

 The court further finds that even if it were to hold that Mr. Harris has made out an arguable *prima facie* case of discrimination, Buckeye has presented substantial non-discriminatory reasons for its actions, namely, Mr. Harris' continued medical problems. It was these medical problems that caused Buckeye to first relieve Mr. Harris from his duties in the Woodyard when there was no suitable light duty work that could be offered to him there. And later when his position in the administrative building ended and there were no other suitable positions available for him there, it was again his continuing medical problem that prevented Mr. Harris from going back to work in the Woodyard. When Buckeye could not find suitable work for Mr. Harris, he was terminated. Mr. Harris' failure to rebut any of Buckeye's justification evidence makes the entry of summary judgment in this case, therefore appropriate.[2] *See Grigsby*, 821 F.2d at 595–96.

**B. Failure to Reinstate Promptly**

 Mr. Harris also asserts that Buckeye's failure to reinstate him in the Woodyard after he had been medically cleared was discriminatory. Again, Buckeye has presented overwhelming evidence that its reasons for not rehiring Mr. Harris until June 17, 1986, was because of concern over whether he was medically fit to return to work. As soon as the company was notified directly by Mr. Harris' treating physician that he was capable of resuming his previous duties, he was hired back. Mr. Harris has presented no evidence that Buckeye's failure to rehire him any sooner resulted from any discriminatory motive on the part of Buckeye. There being no evidence that the proffered reasons for Buckeye's conduct is pretextual, summary judgment is appropriate.

*Conclusion*

Because Mr. Harris has the burden at trial to prove by a preponderance of the evidence that Buckeye's conduct in this case was racially motivated, and that the non-discriminatory reasons given by Buckeye for its conduct are pretextual, the court is of the opinion that, based on the facts of record, no jury could properly proceed to find Buckeye liable in this Title VII action. Accordingly, defendant's motion for summary judgment is GRANTED, and Mr. Harris' action is dismissed in its entirety with prejudice.

---

yond four months. He does not, however, explain what her medical condition was at the time, what kind of work she performed before and after her injury, or even what pay rate she was given. In other words, he has presented no facts that would allow this court to find that a comparably *situated person was treated differently from plaintiff*. His evidence is, therefore, insufficient to raise a *prima facie* case of discrimination.

2. For example, plaintiff could have presented deposition testimony of the two persons allegedly treated more favorably in this case, or he could have gotten records of any new employees hired into the Woodyard during the relevant time periods. Instead, he has decided to rely solely on his conclusory affidavit that is supported with no business records or other testimonial evidence.